UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.

**FLOW PRODUCTIONS, INC.,**
a Florida corporation,

      Plaintiff,

vs.

**REED ELSEVIER, INC.**
a Massachusetts corporation; and
**INTERNATIONAL MEDICAL NEWS GROUP, INC.,** a Maryland
corporation,

      Defendants.
_____/

### COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, FLOW PRODUCTIONS, INC., a Florida corporation ("Flow"), sues Defendants, REED ELSEVIER, Massachusetts corporation ("Elsevier") and INTERNATIONAL MEDICAL NEWS GROUP, INC., a Maryland corporation (IMNG and Elsevier are referred to collectively as the "Defendants") and states as follows:

### JURISDICTION, VENUE AND THE PARTIES

1. Pursuant to 28 U.S.C. §1332, this Court has original jurisdiction as to all claims through diversity of citizenship. The amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Flow is a Florida corporation, with a principal address of 2111 Ocean Drive, New Smyrna Beach, Florida 32169.

3. Upon information and belief, Reed Elsevier, Inc. ("Elsevier"), is a Massachusetts corporation, registered to do business in Florida, with a principal address of Two Newton Place 350, Newton, MA 02458.

4. Upon information and belief, International Medical News Group, Inc., is a Maryland corporation ("IMNG"), with its principal place of business at 60 Columbia Road, Building B, Morristown, NJ 07960-4535.

5. Venue is proper in the Tampa Division of the United States District Court for the Middle District of Florida, because both defendants direct their products into this district, the events and pursuant to a venue clause in the Non-Disclosure Agreement signed between Elsevier and Flow.

6. All conditions precedent to this action have been performed, have occurred, or have been waived.

## SYNOPSIS

7. Mega-corporation Elsevier and its subsidiary IMNG, induced Plaintiff, Flow Productions, Inc. ("Flow"), a small, start-up corporation, by signing non-disclosure agreements, and by promising a great future together, to divulge valuable confidential business information to Defendants, essentially teaching Defendants how to capitalize and exploit their existing content in a new media. Then, after learning all they could,

Defendants breached the NDAs, retained Flow's confidential information, and denied Flow the benefits of Flow's efforts.

## FACTS

8. W. Campbell Douglass, III, M.D., M.S. ("Camp") is a small-town doctor, born and raised in central Florida. Camp has dedicated his professional career to serving the residents of Florida in his work as an emergency room physician. Camp is the driving force behind Flow Productions, Inc.

9. In addition to his regular practice, Camp developed an interest in writing and producing broadcast radio programs to educate the public about current medical topics.

10. In early 2005, while developing a radio program for a local Orlando radio station, Camp discovered a new way of creating and distributing audio programs—podcasting[1]—that piqued his interest. Upon further research, Camp discovered that podcasts are very similar to radio broadcasts, except that podcasts are archived, and thus fixed recordings targeted at a much larger and broader audience, or specifically targeted to a select niche audience, and may be accessed at a listener's convenience.

11. The concept of fixing content, particularly up-to-date medical information, in easily-accessible, bite-sized "chunks" intrigued Camp, as in the past, the best way to

---

[1] "A podcast is a collection of digital media files which are distributed over the Internet, often using syndication feeds, for playback on portable media players and personal computers. The term podcast, like "broadcast", can refer either to the series of content itself or to the method by which it is syndicated; the latter is also termed podcasting. The host or author of a podcast is often called a podcaster." Wikipedia, http://en.wikipedia.org/wiki/Podcasting (accessed March 30, 2008).

3

acquire such information—reading or attending conferences—required a significant time commitment.

12. Camp envisioned re-purposing written content into a convenient, portable media that would enable busy medical professionals, like himself, to stay abreast of the latest medical news without requiring a significant commitment of time or money. Moreover, because such podcasts would be archived online and available on demand, they could be accessed at the listener's convenience from anywhere in the world where professionals are on the Internet.

13. In May 2005, while drinking a cup of coffee and reading Defendants' publication, *Family Practice News* ("FPN"), in the Lake Wales McDonald's, Camp had a flash of insight. He realized that the copy of FPN in his hand contained a goldmine of information that could be re-purposed into downloadable, readily-accessible, bite-sized broadcasts—podcasts!

14. While still at the Lake Wales McDonald's, Camp called FPN's editor, Denise Napoli ("Napoli"), and introduced himself. Camp explained to Napoli that he had a revolutionary new idea in which FPN's parent company, IMNG, would be interested. Napoli expressed interest and referred Camp to IMNG President Alan Imhoff ("Imhoff") and IMNG Vice President Sylvia Reitman ("Reitman").

15. As a next step, Camp contacted Imhoff and explained that he had a potential new business opportunity to discuss with them on the condition that IMNG execute a Confidential Disclosure Agreement (the "CDA") to prohibit IMNG's use of

Camp's "technical or business information . . . trade secret or other 'confidential' matter," (the "Confidential Information"). A true and correct copy of the Confidential Disclosure Agreement is attached hereto as **Exhibit A**.

16. Once Imhoff and IMNG agent Jeffrey Davis ("Davis") executed the CDA on behalf of IMNG, Camp convened a telephone conference on or about May 9, 2005 (the "May 9 Conference") to outline his ideas.

17. Participating on behalf of IMNG on the May 9 Conference were Imhoff, Davis and Mark Branca ("Branca"), who all admitted at the outset that they had *no prior knowledge* of podcasting and had never even heard of it.

18. Thus, Camp explained the basics of podcasting, and his business model and strategies for repurposing IMNG content into high-quality, professional podcasts, which could be leveraged to create a whole new revenue stream for IMNG.

19. Imhoff, Davis and Branca were enthusiastic, and requested that Camp send a formal proposal to IMNG.

20. In response, Camp drafted a letter to IMNG outlining his plan for creating a prototype web site, www.medicalnewspodcasts.com, and several demonstration podcasts ("demos"), so that IMNG's decision-makers could get a real sense of how Camp's podcasting business model would function.

21. IMNG must have liked what it heard, as Imhoff requested that Camp continue to flesh out this new business and submit a formal another draft of a proposal for his review.

22. Throughout the summer and fall of 2005, Camp worked tirelessly to provide IMNG with literally thousands of hours of consultation, training and support to educate IMNG about the basics of the technology of podcasting and the mechanics of implementing the business model that Camp created. To this end, Camp prepared numerous meeting agendas, PowerPoint presentations, demo productions, in addition to supplying continuous support by email, telephone and in-person meetings.

23. In late 2005, less than *six months* from Camp's initial contact with IMNG, Flow and IMNG secured a paid sponsorship from Ortho-McNeil Neurologics ("OMN") for STAT!, a podcast that drew upon content from IMNG's print publication *Clinical Neurology News*. Subsequently, due largely in part to Camp's travel to and participation in marketing and sales pitches, OMN's sponsorship was renewed in 2006 and 2007.

24. Shortly thereafter, in 2006, the second paid sponsorship for a podcast was secured from GlaxoSmithKline for HEADWAY ON MIGRAINE HEADACHES, a podcast relating to medical developments for migraine headaches.

25. The first podcast was published with great fanfare. In a 2006 article entitled, *Putting Feeling into Content*, Imhoff adopted Camp's ideas as his own, bragging,

> From our perspective, there are two ways to approach this new medium; low-cost, low-production value (basically a droning voice reading from a print source); or a more costly, but better produced, product that plays to the medium's strengths. We chose that route so we could separate ourselves from the amateurs.

A true and correct copy of this interview is attached hereto as **Exhibit B**.

26. In March 2006, IMNG held a podcasting "summit" for its marketing people in New Jersey. IMNG paid for Camp to travel to the meeting to give a presentation to educate about 20 IMNG employees about podcasting. Imhoff's boss, Kevin Hurly ("Hurly"), who was present at this meeting, was so impressed with Camp's podcasting ideas that he asked Camp to give the same presentation to IMNG's parent corporation, Elsevier, in New York City.

27. Camp readily agreed, and on or about mid-March 2006, Hurly referred Camp to Elsevier Executive Scott Rismiller ("Rismiller"). Before having any discussions with Rismiller, Camp required Rismiller to execute a Non-Disclosure Agreement (the "NDA"). A true and correct copy of the NDA is attached hereto as **Exhibit C**.

28. Once Rismiller executed the NDA, Camp explained his idea for a Global Podcast Network, which encompassed a multi-channel podcasting website, with various channels providing different types of podcasting content. Rismiller expressed interest in hearing more and invited Camp and his wife, Kathy, to Elsevier's corporate headquarters in New York City to give the presentation to others at Elsevier.

29. At the second presentation to Rismiller and numerous other Elsevier executives and staff, Camp introduced the idea for a Global Podcast Network and entertained numerous questions from the audience.

30. At the conclusion of the presentation, Rismiller invited Camp to draft a proposed business plan for the Global Podcast Network idea for presentation to Reed Ventures, upon information and belief, Elsevier's venture capital arm, for funding.

31. Camp, with Rismiller's helpful supervision, drafted a proposed business plan and submitted it to Greg Samios ("Samios") at Reed Ventures. Ultimately, Reed Ventures passed on funding the Global Podcast Networks. Samios told Camp that the plan was interesting but needed more development for Reed Ventures to be interested.

32. Flow then established a separate business entity, Raw Flow, LLC, to move forward with further design and development of an information technology ("IT") infrastructure and proof of concept for Global Podcast Networks.

33. Finally, on or about January 30, 2007, Camp presented the GPN live, online proof of concept presentation to Imhoff and Squires in Daytona Beach, Florida. Imhoff was present in person, and Squires was present telephonically and online.

34. Imhoff and Squires were very excited about what they saw in the presentation, and suggested that Camp allow IMNG to take control of the www.medicalnewspodcasts.com[2] portal. Though Camp declined, Imhoff represented that he and Squires would be presenting the Global Podcast Networks concept to Elsevier at an upcoming regional meeting and would be putting Camp in touch with Elsevier's key people to move Flow's Global Podcast Networks concept forward.

---

[2] Medical News Podcasts is a concept that Camp developed that includes a website that serves as a portal to multiple podcast channels offering a variety of different genres of podcasts.

8

Despite their promises to Flow, neither Squires nor Imhoff ever introduced Flow or Camp to any "key" people at Elsevier.

35. Despite the ongoing success of the STAT! and HEADWAY ON MIGRAINE HEADACHES podcasts, IMNG and Elsevier continued to be evasive when Camp pressed for a formal, written agreement. After nearly three years of providing extensive business advice, consultation, technical support and education that culminated in a successful and revolutionary new medium of distributing content, neither IMNG nor Elsevier could be bothered to define specific terms of their partnership with Flow.

36. This worried Camp, as he had rendered extensive, valuable services to IMNG and Elsevier, including but not limited to business advice, consultation, technical support and education, in addition to providing both with a wholly new business strategy, of which neither had any prior knowledge, specifically relying on Defendants' promises to compensate Flow pursuant to a formal agreement.

37. Camp's concern was justified, because the parties' relationship began to deteriorate in 2007, when, upon information and belief, IMNG and Elsevier began developing their own podcasts and podcasting sites, intending to deprive Flow of the full value of its business ideas and three years of nearly continuous services.

38. Upon information and belief, by 2007, Defendants realized that podcasting was, as Camp predicted, an expanding segment of the publishing business and an extremely lucrative opportunity to gain sponsorships. Therefore, upon information and belief, Defendants began to take steps to terminate their relationship with Flow and

retain all benefit and use of the Confidential Information. In fact, in March 2007, though Imhoff had verbally assured Camp that any further podcasts based on IMNG or Elsevier publications would be produced by the Flow/IMNG Partnership, Camp discovered that IMNG was producing the Skin and Allergy News podcast without Flow's consent or knowledge, using the training, instruction and manuals that Camp had authored and provided.

39. Then, in November 2007, IMNG notified Flow that the HEADWAY ON MIGRAINE HEADACHES podcast was to be posted on www.ReachMD.com. This was surprising, as IMNG had not apprised anyone at Flow of any negotiations with ReachMD, let alone the details of any agreement with ReachMD – in fact neither Imhoff nor Squires bothered to inform Flow of this new deal – the news came from one of their subordinates.

40. The Parties' relationship continued to deteriorate during this latter part of 2007, when Camp began pressing Defendants to enter into a formal agreement. After protracted negotiations, the Parties were unable to come to any agreement, and ultimately parted ways officially, with the Letter of Termination sent on or around January 18, 2008.

41. Thereafter, on or around January 20, 2008, as Flow suspected, IMNG had already developed and launched a directly competing podcast and portal/website using the Confidential Information that Camp conveyed to IMNG under the CDA and the NDA that IMNG and Elsevier executed in 2005.

42. Defendants have retained and are benefiting from Camp's ideas, business methods, trade secrets and confidential information (the "Confidential Information") that was provided only pursuant to and because of Defendants' execution of the CDA and NDA and other related promises.

## COUNT I
### BREACH OF NON-DISCLOSURE AGREEMENTS (AGAINST ELSEVIER AND IMNG)

43. Flow reincorporates and realleges as if fully set forth herein paragraphs 1-42 above.

44. Plaintiff Flow Productions, Inc. agreed to provide Defendants with ideas, business methods, trade secrets and confidential information (the "Confidential Information") only pursuant to two non-disclosure agreements.

45. Defendant IMNG executed a Confidential Disclosure Agreement (the "CDA") on or about May 6, 2005 to induce Plaintiff Flow Productions, Inc. to divulge valuable, protectable confidential business information. A true and correct copy of the Confidential Disclosure Agreement is attached hereto as **Exhibit A**.

46. The CDA provides that IMNG shall not "disclose to others or use any technical or business information . . . trade secret or other 'confidential' matter disclosed by [Flow] for a period of ten (10) years from the date of the Agreement[.]"

47. Defendant Elsevier executed a Non-Disclosure Agreement (the "NDA") on or about March 10, 2006 to induce Plaintiff Flow Productions, Inc. to divulge valuable, protectable confidential business information. A true and correct copy of the Non-Disclosure Agreement is attached hereto as **Exhibit C.**

**48.** Paragraph 2 of the NDA provides that Elsevier "shall use Confidential Information solely in furtherance of [Elsevier's] analysis of whether to enter into a business relationship with [Flow, and] shall not otherwise use in any way, or disclose to any third party, any Confidential Information[.]"

**49.** Plaintiff's president, W. Campbell Douglass, III, M.D., M.S., shared the Confidential Information relying on the CDA and the NDA to prevent Defendants' use and/or disclosure of the Confidential Information.

**50.** Despite executing the CDA and NDA, Defendants are breaching the CDA and NDA by producing and distributing podcasts using Plaintiff's Confidential Information, including its methods, plans and strategies disclosed to Defendants only within the confines of the NDA and/or CDA.

**51.** As a result of Defendants' breaches, Plaintiff has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, Flow Productions, Inc., demands judgment for compensatory damages, lost profits, consequential and incidental damages, special damages, pre-judgment interest, pre- and post-judgment interest and any other remedy that the court deems just and proper.

## COUNT II
## UNJUST ENRICHMENT (AGAINST ELSEVIER AND IMNG)

**52.** Flow reincorporates and realleges as if fully set forth herein paragraphs 1-42 above.

53. Flow expended significant amounts of money and manpower over the past 3 years in providing consulting, education and training services to Defendants with respect to the implementation and strategy for setting up a new business model related to podcasting.

54. Defendants were aware of, approved, accepted, supported, encouraged and benefited from Flow's efforts.

55. Once the podcasting business became highly profitable, and after Defendants knowingly and voluntarily accepted the benefits of Camp's Confidential Information, Defendants wrongfully terminated their relationship with Flow, yet retained and continued to use and profit from Flow's services and intellectual property.

56. Under the circumstances, it would be substantially inequitable to allow Defendants to benefit from Flow's efforts in developing and nurturing the podcast business to get it up and running, and then, once the podcast business was highly profitable, sever all ties with Flow.

57. Unless Defendants compensate Flow for its services, they will be unjustly enriched at Flow's expense.

WHEREFORE, Plaintiff, Flow Productions, Inc., demands judgment for compensatory damages, consequential and incidental damages, special damages, pre-judgment interest, post-judgment interest and any other remedy that the court deems just and proper.

## COUNT III
## QUANTUM MERUIT (AGAINST ELSEVIER AND IMNG)

58. Flow reincorporates and realleges as if fully set forth herein paragraphs 1-42 above.

59. Flow expended significant resources over three years in developing, promoting and maintaining the implementation and strategy for setting up a new business model related to podcasting.

60. Defendants were aware of, approved, accepted, supported, encouraged and benefited from Flow's efforts.

61. Once the podcasting business became highly profitable, and after Defendants knowingly and voluntarily accepted the benefits of Camp's Confidential Information, Defendants wrongfully terminated their relationship with Flow, yet retained and continued to use and profit from Flow's services and intellectual property.

62. Under the circumstances, it would be substantially inequitable to allow Defendants to benefit from Flow's efforts in developing and nurturing the podcast business to get it up and running, and then, once the podcast business was highly profitable, sever all ties with Flow.

63. Unless Defendants compensate Flow for its services, they will be unjustly enriched at Flow's expense.

WHEREFORE, Plaintiff, Flow Productions, Inc., demands judgment for compensatory damages, consequential and incidental damages, special damages, pre-

judgment interest, post-judgment interest and any other remedy that the court deems just and proper.

## COUNT IV
## BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY (AGAINST ELSEVIER AND IMNG)

64. Flow reincorporates and realleges as if fully set forth herein paragraphs 1-42 above.

65. Elsevier, IMNG and Flow were partners (the "Partnership") in a for-profit joint venture that produced podcasts since 2005. Pursuant to an oral agreement, the partners in the Partnership agreed to share profits and losses derived from the sale of podcast sponsorships, and to equitably apportion certain intellectual property rights in and to the podcasts.

66. As partners in the Partnership, Elsevier, IMNG and Flow owed to one another a fiduciary duty of loyalty which included a duty to refrain from competing with the Partnership and/or misappropriating the Partnership's opportunities.

67. Elsevier and IMNG, upon information and belief, acted in concert beginning sometime in 2007, to surreptitiously build and launch a podcasting web site (the "Competing Site") in anticipation of their plan to terminate their relationship with Flow, after Elsevier and IMNG had received the benefit of nearly three years of education and training from Flow.

68. Upon information and belief, once Elsevier and IMNG had completed development of the Competing Site—in January 2008—they terminated their

15

relationship with Flow in late January 2008 and launched the Competing Site a few days later.

69. Further upon information and belief, Elsevier and IMNG have generated revenues that rightfully belong to the Partnership without sharing such revenues with Flow, or providing Flow with an accounting.

70. Elsevier and IMNG breached their duty of loyalty to Flow by competing against Flow and the Partnership by building and launching a Competing Site, by misappropriating the Partnership's opportunities to expand the Partnership's podcasting business, and by failing to account to Flow for partnership revenues.

71. IMNG and Elsevier never disclosed the fact that they were competing with the Partnership, offer Flow the right to participate in such new venture nor did either Defendant seek or obtain Flow's approval or consent.

72. As a result of Elsevier's and IMNG's breaches of their fiduciary duty to Flow and their duty of loyalty for Flow and the Partnership, Flow has suffered damages.

WHEREFORE, Plaintiff, Flow Productions, Inc., demands judgment for an accounting of all profits derived from any usurped or misappropriated opportunities, and any other remedy that the court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Flow Productions, Inc., hereby demands a trial by jury on all counts triable as such.

**Date: April 1, 2008**

_____
Harry P. Teichman
Florida Bar No. 0157211
Suzette M. Marteny
Florida Bar No. 0668591
Trial Counsel
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
201 N. Franklin Street Suite 2100
Tampa, Florida 33602
Telephone: (813) 202-1300
Facsimile: (813) 202-1313
Email: hteichman@ssd.com
Email: smarteny@ssd.com
*Attorneys for Plaintiff, Flow Productions, Inc.*